DJW/bh

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MILO A. JONES,

                          **Plaintiff,**

                                             CIVIL ACTION

**v.**

                                             No. 04-3255-JWL-DJW

JUSTIN COURTNEY,

                          **Defendant.**

## REPORT AND RECOMMENDATION

## NOTICE

Within ten days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72, file written objections to such proposed findings and recommendations, including any findings of fact and conclusions of law.  A party must file any objections within the ten-day period if that party intends to seek appellate review of the proposed findings of fact, conclusions of law, and/or recommended disposition.  If no objections are timely filed, no appellate review will be allowed by any court.

## REPORT AND PROPOSED FINDINGS

### I.    Background Information

This is a civil rights action brought pursuant to 42 U.S.C. § 1983.  Plaintiff was an inmate in the custody of the Kansas Department of Corrections ("KDOC") at all times relevant to this lawsuit.  Plaintiff claims that Defendant, who was an officer at the El Dorado, Kansas Correctional Facility where Plaintiff was housed, used excessive force against him in violation of his Eighth and Fourteenth Amendment rights.

Defendant was initially represented by the Office of the Attorney General for the State of Kansas.  On August 4, 2005, Defendant's counsel filed a Motion to Withdraw (doc. 49), indicating that his repeated attempts to communicate with Defendant had been unsuccessful and that his ability to defend Defendant was severely hampered.  On September 2, 2005, the Court granted his counsel leave to withdraw (*see* doc. 54).

Thereafter, Defendant proceeded pro se, but repeatedly refused to comply with discovery requests and deposition notices.  Plaintiff moved for sanctions against Defendant (doc. 74) and requested that the Court enter default judgment against Defendant.  The undersigned issued a Report and Recommendation (doc. 82) on March 9, 2006, recommending that Plaintiff's Motion for Sanctions be granted and that default judgment be entered against Defendant.  The District Judge adopted the Report and Recommendation (doc. 89) without any objections filed by Defendant.  The District Judge granted Plaintiff's Motion for Sanctions and ruled that default judgment would be entered against Defendant.  Plaintiff was directed to file, pursuant to Federal Rule of Civil Procedure 55(b)(2), an application for default judgment and documentation that would permit the Court to determine the amount and nature of the judgment to be entered against Defendant.

Plaintiff has filed a Motion for Default Judgment (doc. 121), which the District Judge referred to the undersigned (see doc. 123) for report and recommendation.[1]  An evidentiary hearing regarding Plaintiff's Motion for Default Judgment was held before the undersigned on August 8, 2007.  Plaintiff appeared through counsel and in person.  Defendant did not appear.

---

[1]*See* Order Referring Mot. for Report and Recommendation (doc. 76).

2

## II.     Factual Findings

The undersigned makes the following factual findings pertinent to resolution of this motion based on the evidence presented at the August 8, 2007 evidentiary hearing.

1.      Plaintiff has been incarcerated at the El Dorado, Kansas Correctional Facility since 1999.

2.      Plaintiff is a practicing member of the Hebrew Israelite religion.

3.      As part of his religious faith, Plaintiff wears a yarmulke, or kippa, as Plaintiff refers to it.

4.      Some time in April 2004 or earlier, Plaintiff received a written permission slip from the prison Chaplin, Chaplin Dow, indicating that Jewish inmates were allowed to wear the yarmulke. Based on that permission slip, Plaintiff believed he had permission to wear his kippa.[2] Some time in April 2004, Defendant told Plaintiff he had to remove his kippa. Plaintiff informed Defendant and Sergeant Gaskill that he had a permission slip in his cell that allowed him to wear the kippa. Plaintiff showed the permission slip to Defendant, and Plaintiff assumed he would have no further trouble if he wore his kippa.

5.      Several days later, on April 21, 2004, Plaintiff was being escorted out of his cell to the exercise yard by Sergeant Gaskill. At that time, Plaintiff was wearing his kippa, and Sergeant Gaskill made no comment about it. As they proceeded downstairs, Defendant stopped Plaintiff and told him that he could not wear his kippa because it was not approved, or words to that effect. Defendant then ordered Plaintiff to go upstairs and return to his cell.

---

[2]See Pl.'s Ex. 1.

6.      Plaintiff returned to his cell, this time escorted by Officer Chairs.  Plaintiff left his kippa in his cell.  He was then escorted downstairs from his cell downstairs, with his custody transferred from Officer Chairs to Defendant.

7.      Plaintiff's hands were in handcuffs in front of him and a chain was around his waist. Without provocation from Plaintiff, Defendant pulled on Plaintiff's chain from behind Plaintiff.  As Plaintiff turned his head to look back at Defendant, Defendant slammed Plaintiff to the floor and put him in a headlock.  Defendant repeatedly pushed Plaintiff's face into the floor.  Then Defendant began "twisting" and choking Plaintiff, which rendered Plaintiff unable to breathe.

8.      Either Defendant or one of the other security officers "hit the code" and other officers responded to the call and attempted to intervene.  Officer Gaskill told Defendant "to move to points."[3]  Plaintiff understood this to mean that Defendant was supposed to press on of Plaintiff's pressure points rather than continue choking him.

9.      At no time during the incident did Plaintiff say anything to Defendant to provoke him nor did he resist Defendant or attempt to harm or kick Defendant.

10.      Other officers intervened, and Plaintiff was taken to the showers.  The officers asked Plaintiff if he was injured and whether he needed help.  They took pictures of Plaintiff's injuries.

11.      Plaintiff's hand was swollen and he had a knot on one of his fingers.  He also injured his left shoulder.

12.      Plaintiff was seen by a nurse approximately one and one-half hours after the incident. The nurse's record reveals the following:

> [U]se of force exam inmate became involved in a use of force to the floor at approx 0830 this a.m. he was brought into the sickcall room walking without limp or

[3]Ev. Hr'g Tr. 11:22.

guarding actions, inmate complain of right hand hurting noted that he has swelling noted above the ring finger and little finger very tender to touch can move fingers with guarding noted inmate also c/o left collar bone noted swelling on the left side very tender to touch and uses guarding with any movement.[4]

13.     Plaintiff was given Ibuprofen for his pain and was allowed to take it for the next five days.  Plaintiff's right wrist and left clavicle were x-rayed.  No x-rays were admitted into evidence at the hearing, and no evidence was presented to indicate that Plaintiff suffered any broken bones.

14.     Plaintiff was evaluated by a nurse four days later, on April 25, 2004.  The record from that evaluation reveals that Plaintiff complained of aching and "some sharp pains" in his left shoulder and lower back.  The pain's intensity" was described as "mild. " The record also shows that Plaintiff had stiffness and tenderness in his left shoulder and tenderness in his lower back and that his range of motion was limited due to pain.  Plaintiff was instructed to (1) use a cold pack, (2) apply heat, and (3) limit recreational activity.[5]

15.     Plaintiff was seen again by a nurse on April 30, 2004.  The record from that evaluation indicates that Plaintiff complained of dull and throbbing pain in his shoulder of "moderate" intensity.  The record also notes that Plaintiff was able to perform range of motion with his affected limb and that range of motion was normal in his left shoulder.  Plaintiff was permitted to take Ibuprofen for the next five days and was instructed to limit recreational activity.

16.     On May 6, 2004, Plaintiff was again evaluated by a nurse.  The evaluation report indicates that Plaintiff complained of constant pain of severe intensity in his back and radiating up to his right shoulder.  The record reports Plaintiff stating:  "About 3 month ago pulled something in my back has hurt ever since."  Under "History Notes" the record indicates:  "States he pulled

---

[4]Pl.'s Ex. 2, 4/21/2004 Nursing Patient Progress Note.

[5]Pl.'s Ex. 2, 4/25/2005 Non-Specific Musculoskeletal Flow Sheet.

something in his back approximately three months ago and now it causes shooting pains up through to his right shoulder."[6]   The nurse's assessment was "Impaired Physical Mobility Related to Back Pain."[7]  Plaintiff was to continue taking Ibuprofen for his pain.

17.    Plaintiff was evaluated by a physician five days later, on May 11, 2005.  The doctor prescribed Methocarbamol (a muscle relaxant) and Naproxen and discontinued the Ibuprofen.  The doctor's record indicates that "[i]nmate injured back in confrontation on 4-21-04," and notes that Plaintiff complained of back pain.[8]  The doctor recommended Plaintiff do back exercises.

18.    On May 20, 2004, Plaintiff was re-evaluated by a nurse.  The record of that evaluation indicates that Plaintiff was suffering intense back pain and that he reported the medication was not working.  The nurse instructed Plaintiff to do a routine of stretching exercises and to give the medication "a little more time to work."[9]  Under the heading "History of trauma or overuse," the record states:  "long history of lifting heavy things."[10]  Under the heading "Precipitation factor," the record states:  "age and lifting things."[11]

---

[6]Pl.'s Ex. 2, 5/6/2005 Non-Specific Musculoskeletal Flow Sheet.

[7]*Id.*

[8]Pl.'s Ex. 2, 5/11/2004 Patient Chronic Care Evaluation Record.

[9]Pl.'s Ex. 2, 5/20/2004 Non-Specific Musculoskeletal Flow Sheet.

[10]*Id.*

[11]*Id.*

19.     On June 13, 2004, the records reveal that Plaintiff requested refills of his medication as they had run out.  Plaintiff was given Ibuprofen and told that the doctor would need to be consulted before his other medications could be refilled.[12]

20.     On June 20, 2004, the records show that Plaintiff was seen again by a nurse. The record for that evaluation indicates Plaintiff complained of "aches" in his back of moderate intensity and that he had been suffering with aches for two months.  The nurse noted that Plaintiff was able to perform range of motion with the affected limb but with mild to moderate pain.  The Ibuprofen was continued and Plaintiff was directed to limit recreational activity.  A cold pack to be followed by heat was also provided or recommended.[13]

21.     Plaintiff was evaluated once again by a nurse on July 4, 2004.  The record indicates that Plaintiff complained of aching and throbbing in his left shoulder and back, with an onset and duration of one month.  The Ibuprofen was continued and it was again recommended that Plaintiff limit his recreational activity.  A cold pack to be followed by heat was also provided or recommended.[14]

22.     In the early morning hours of July 10, 2004, Plaintiff was found unresponsive and lying on the floor of his cell.  Plaintiff had apparently fallen off the sink in his cell.[15]  After Plaintiff became responsive, he reported severe head and neck pain, with pain radiating down his back.  He was transported to an area hospital with possible neck and head trauma.  Plaintiff received a CT scan of his head, which was negative.  He was diagnosed with a concussion and returned to the infirmary

---

[12]Pl.'s Ex. 2, 6/13/2004 Nursing Patient Progress Note.

[13]Pl.'s Ex. 2, 6/20/2004 Non-Specific Musculoskeletal Flow Sheet.

[14]Pl.'s Ex. 2, 7/4/2004 Non-Specific Musculoskeletal Flow Sheet.

[15]Pl.'s Ex. 2, 7/10/2004 Nursing Patient Progress Note and Head Injury Flowsheet.

at the Correctional Facility.  The prison nurse performed periodic neurological checks, but in the late morning, Plaintiff refused any further neurological checks and medical care.  Plaintiff was therefore released from the infirmary and returned to his cell.[16]

23.    Plaintiff reported for "sick call" the following day and requested Ibuprofen for a headache.  A neurological check was performed and it was noted that Plaintiff had decreased range of motion "due to discomfort with recent fall hx [history]."[17]

24.    On November 15, 2004, Plaintiff was seen by a nurse and complained of "continuous ache [in his back] never lets up only gets worse" that radiated at times down both legs.  The record shows the onset date and duration was "a couple years ago."  It also states "lots of heavy lifting and a few car wrecks" under the heading "History of trauma or overuse."  The record indicates that Plaintiff would be referred to a health care provider for refill of Valtaren (an anti-inflammatory).  Plaintiff was continued on Ibuprofen.[18]

25.    On November 24, 2004, Plaintiff was again seen by a nurse at which time Plaintiff complained of constant "sharp stabbing pain" in his back with an onset and duration of seven months.  The record stated "none" under the headings "History of trauma or overuse" and "History of past injury to affected area."  Plaintiff was allowed Tylenol and a cold pack followed by heat pack.  He was instructed to do back exercises and limit recreational activity.[19]

26.    Plaintiff testified that after the incident his injuries prevented him from engaging in physical exercise for approximately two or three months.   He testified that he was in a car wreck

---

[16]Pl.'s Ex. 2, 7/10/2004 Head Injury Flowsheet and Medical Progress Notes and Orders.

[17]Pl.'s Ex. 2, 7/11/2004 Nursing Patient Progress Note.

[18]Pl.'s Ex. 2, 11/15/2004 Non-Specific Musculoskeletal Flow Sheet.

[19]Pl.'s Ex. 2, 11/24/2004 Non-Specific Musculoskeletal Flow Sheet.

prior to being incarcerated (i.e., prior to 1999), but he did not recall reporting that to any of the medical personnel at the El Dorado Correctional Facility.   He also testified that he suffered a back injury while in the county jail prior to his incarceration at the El Dorado Correctional Facility,[20] but that he has never associated the back pain he suffered in 2004 with that injury.

27.     Plaintiff testified that he still continues to suffer from back and shoulder pain.  He is not presently receiving any pain medications for his injuries.  He did not specify how long he has been off the pain medication except to state "it has been awhile."[21]  He is currently not taking any medication because the Facility has policy "where they put on [medication] for so long and then take you off."[22]

### III.     Plaintiff's Claims for Damages and Other Relief

Plaintiff contends that Defendant's actions "resulted in several significant injuries, including an injured shoulder and wrist, severe back pain, and mental and emotional injuries, including post traumatic stress."[23]  In his Application for Default Judgment, Plaintiff seeks compensatory damages of at least $50,000. He also seeks nominal damages, in addition to punitive damages in the amount of $20,000.00.  Plaintiff also seeks a declaratory judgment against Defendant that his actions violated Plaintiff's rights under the Eighth and Fourteenth Amendments.  Finally, he seeks his attorney's fees and costs.  These claims are consistent with the claims pled in his initial Complaint

---

[20]Plaintiff did not testify as to when that back injury occurred, but the Court assumes it was prior to the time he was incarcerated at the El Dorado Correctional Facility.

[21]Ev. Hr'g Tr. 25: 6-8.

[22]Id., 25: 3-5.

[23]Pretrial Order (doc. 104), ¶ 5.a.

and with those asserted in the Pretrial Order, with the exception that no amount of punitive damages is specified in the Pretrial Order.

At the evidentiary hearing, Plaintiff reiterated his claim for (1) compensatory damages in the amount of $50,000.00 for pain and suffering, nominal damages, and (2) punitive damages in the amount of $20,000.

## IV.    Damages

### A.    Applicable Law Regarding the Award of Damages

#### 1.    *The award of damages upon default judgment*

Once a court determines that a defendant is in default, the factual allegations of the plaintiff's complaint must be taken as true regarding the causes of action pled.[24]  This includes any allegations that the defaulting defendant acted maliciously, wilfully, or wantonly so as to entitle the plaintiff to recover punitive damages.[25]  In contrast, the Court does not automatically accept as true allegations as to the amount and character of the plaintiff's damages.[26]

Federal Rule of Civil Procedure 54(c) limits the amount of damages that a plaintiff may recover on default to the amount which the plaintiff claims in the prayer for relief in the complaint.[27]

---

[24]*Meitler Consulting, Inc. v. Dooley*, No. 05-2126-DJW, 2006 WL 4041752, at *2 (D. Kan. Nov. 1, 2006)*; U.S. v. Ware*, No. 96-2167-GTV, 1997 WL 383069, at *2 (D. Kan. June 18, 1997)*; Beck v. Atlantic Contracting Co., Inc.*, 157 F.R.D. 61, 64 (D. Kan. 1994); *see also* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2688 at 58-59 (3d ed. 1998) and cases cited therein.

[25]*Meitler*, 2006 WL 4041752, at *2; *see also Beck* , 157 F.R.D. at 64 (entering default judgment and accepting as true the allegations regarding defendant's willful and wanton conduct, entitling the plaintiff to recover punitive damages).

[26]*Meitler*, 2006 WL 4041752, at *2; *Beck*, 1994 WL 608598, at *1.

[27]*Albert v. Wesley Health Servs.*, No. 00-2067-KHV, 2001 WL 503241, at *1 (D. Kan. May 10, 2001).

Specifically, Rule 54(c) states that "[a] judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment."[28]

2.     *The award of compensatory damages under § 1983*

The purpose of § 1983 damages is to provide compensation for injuries caused by the violation of a plaintiff's legal rights,[29] and to place the injured party as nearly as possible in the position he would have been absent the defendant's wrongful conduct.[30]  When a § 1983 plaintiff seeks damages for violations of constitutional rights, "the level of damages is typically determined according to principles derived from the common law of torts."[31]  Thus, the plaintiff may be compensated for physical injury, pain, and suffering in an amount proportional to the actual injury incurred.[32]

Consistent with common law tort doctrine, a defendant in a § 1983 action is held responsible for the natural consequences of his or her wrongful actions, including liability for the aggravation of a pre-existing condition, and, consequently, a § 1983 plaintiff is entitled to recover damages for any aggravation of a pre-existing condition, disease or disability.[33]  The § 1983 defendant must take

---

[28]Fed. R. Civ. P. 54(c).

[29]*Memphis Cmty. School Dist. v. Stachura*, 477 U.S. 299, 307 (1986).

[30]*Gaines Towing and Transp., Inc. v. Atlantia Tanker Corp.*, 191 F.3d 633, 635 (5th Cir. 1999).

[31]*Stachura*, 477 U.S. at 306 (citations omitted).

[32]*Jolivet v. Deland*, 966 F.2d 573, 576 (10th Cir. 1992) (quoting *Piver v. Pender County Bd. of Educ.*, 835 F.2d 1076, 1082 (4th Cir. 1987)).

[33]*Wren v. Spurlock,* 798 F.2d 1313, 1321 (10th Cir. 1986) (upholding jury instruction that plaintiff was entitled to recover § 1983 damages for any aggravation of a pre-existing condition or disability proximately resulting from the constitutional violation)*; Shannon v. Lester*, 519 F.2d 76, 79 (6th Cir. 1975) (allowing § 1983 plaintiff to recover for any aggravation of his pre-existing (continued...)

11

a plaintiff as he finds him or her, and if the victim has a pre-existing condition that the constitutional tort aggravates, the defendant is liable for the full consequences.[34]  This is true even if the pre-existing condition makes the consequences of the wrongful act more severe than they would have been for a normal person.[35]

The doctrine of superceding cause also applies to § 1983 cases.[36]  As traditionally understood in common law tort doctrine, a superceding cause "is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his

---

[33](...continued)
condition and pain and suffering proximately caused by unconstitutional delay in providing medical care after arrest);*Caldwell v. McCartney*, No. 1:04-CV-398, 2006 WL 3245739, at *2 (E.D. Tex. Nov. 7, 2006) (§ 1983 plaintiff "may be compensated for physical injury, pain and suffering, and aggravation of an existing disease or defect.").

[34]*Figueroa-Torres v. Toledo-Davila,* 232 F.3d 270, 275-76 (1st Cir. 2000) (applying "eggshell skull" doctrine to § 1983 excessive force case; holding defendant liable for plaintiff's death even though plaintiff's pre-existing sickness made him prone to the injury that resulted in his death; *Niehus v. Liberio,* 973 F.2d 526, 528 (7th Cir. 1992) (applying "eggshell skull" rule to § 1983 case and holding officers liable for the full consequences of their excessive force, even if the consequences would have been much less injurious had it not been for the plaintiff's pre-existing injury); *Pieczynski v. Duffy*, 875 F.2d 1331, 1336 (7th Cir. 1989) (The § 1983 defendant "takes his victim as he finds him . . ., so if the victim has a pre-existing condition for which the tort aggravates, the [defendant] is liable for the full consequences.").

[35]*United Steelworkers of Am. v. Milstead*, 705 F. Supp. 1426, 1439-40 (D. Ariz. 1988) ("When a [§ 1983] defendant's wrongful act causes injury, he is fully liable for the resulting damage even though the injured plaintiff had a pre-existing condition that made the consequences of the wrongful act more severe than they would have been for a normal person.").

[36]*Trask v. Franco*, 446 F.3d 1036, 1046 (10th Cir. 2006); *Warner v. Orange County Dep't of Probation*, 115 F.3d 1068, 1071 (2d Cir. 1997).

antecedent negligence is a substantial factor in bringing about."[37]   A superceding cause will relieve a § 1983 defendant of liability.[38]

### 3.      The award of punitive damages under § 1983

As the Court has already found Defendant to be in default, the Court must accept as true Plaintiff's allegations that Defendant applied excessive force to Plaintiff in a malicious and sadistic manner so as to cause harm to Plaintiff[39] and to entitle Plaintiff to recover punitive damages against Defendant.[40]  Thus, as *liability* for punitive damages has been established, the Court need now only determine the *amount* of damages to be awarded.

Punitive damages are awarded in § 1983 actions to punish defendants for their willful or malicious conduct and to deter others from similar behavior.[41]  Punitive damages are, by definition, not intended to compensate the injured party, but rather to punish a wrongdoer whose action was intentional and malicious.[42]   Consequently, punitive damages in a § 1983 action are typically determined by reference to factors such as the character of the wrong and the amount necessary to

---

[37]Restatement (Second) of Torts § 440.

[38]*Trask*, 446 F.3d at 1046; *Warner*, 115 F.3d at 1071.

[39]Pretrial Order (doc. 104), ¶¶ 6.b(3) & 10.a.

[40]As discussed above, on default, the Court must accept as true the allegations of the plaintiff as to the malicious nature of the defaulting defendant's conduct, and liability for punitive damages is established by the default.  *See Meitler Consulting, Inc. v. Dooley*, No. 05-2126-DJW, 2006 WL 4041752, at *2 (Nov. 1, 2006 D. Kan. Nov. 1, 2006)*; Beck  v. Atlantic Contracting Co., Inc.*, 157 F.R.D. 61, 64 (D. Kan. 1994).

[41]*Memphis Cmty. School Dist. v. Stachura*, 477 U.S. 299, 306 n.9 (1986).

[42]*Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266-67 (1981).

punish the defendant.[43]   The factfinder has a "great deal of discretion" in deciding the amount of the punitive award.[44]

Also, it is well-established that punitive damages should bear a "reasonable relationship to the amount of compensatory damages."[45]  Although punitive damages are not measured by the extent of injury to a plaintiff, actual damages are a proper factor for consideration by the factfinder in determining the amount of punitive damages.[46]

Finally, the factfinder may consider the financial condition of the defendant in determining the amount of punitive damages.[47]   Courts have recognized that "deterrence is directly related to what people can afford to pay."[48]  At the same time, however, courts will not affirm punitive damage award that result in the financial ruin of the defendant.[49]

### B.       Analysis of Plaintiff's Damages

Having determined that Plaintiff is entitled to judgment on the liability issues, the Court must now determine the amount and character of the recovery that should be awarded Plaintiff.

---

[43]*Carlson v. Green*, 446 U.S. 14, 48 (1980).

[44]*Id.*

[45]*BMW of North Am., Inc. v. Gore,* 517 U.S. 559, 581 (1996).

[46]*Poullard v. Turner*, 298 F.3d 421, 423 (5th Cir. 2002).

[47]*Newport, 453 U.S.* at 269 ("By allowing juries and courts to assess punitive damages in appropriate circumstances against the offending official, *based on his personal financial resources*, [§ 1983] directly advances the public's interest.") (emphasis added); *see also Youren v. Tintic School Dist.*, 343 F.3d 1296, 1307 (10th Cir. 2003) (§ 1983 allows juries and courts to assess punitive damages against the defendant based on his personal financial resources).

[48]*Patterson v. Balsamico*, 440 F.3d 104, 122 (2d Cir. 2006) (citations omitted).

[49]*Id.*

### 1.      *Compensatory damages*

The evidence presented by Plaintiff at the evidentiary hearing clearly reflects that Plaintiff incurred injuries as a result of Defendant's actions and that those injuries required medical treatment. It is also clear that Plaintiff's injuries caused Plaintiff pain and suffering.  Shortly after the April 21, 2004 incident, Plaintiff's right hand was swollen and he had a knot one of his fingers. He also had swelling around his left collar bone that rendered his shoulder tender to touch and made him guard his movements.  The injuries appeared serious enough to warrant x-rays of his right wrist and left clavicle.

Four days later, on April 25, 2005, Plaintiff was evaluated by a prison nurse, and Plaintiff reported suffering from aches and sharp pains in his left shoulder and lower back.  On April 30, 2004, Plaintiff reported suffering dull and throbbing pain in his shoulder of moderate intensity, but he had normal range of motion in his left shoulder.  On May 6, 2004, Plaintiff reported constant pain of severe intensity in his back and pain radiating up to his right shoulder.  Plaintiff was given Ibuprofen and  cold and hot packs for his pain.  He was instructed to limit his recreational activity. Then, on May 11, 2004, Plaintiff was prescribed a muscle relaxant and Naproxen for the pain that a prison physician attributed to the April 21, 2004 incident.

Plaintiff was seen by the nurse again on May 20, June 13, June 20, and July 4, 2004.  During those visits, he complained of aching and throbbing in his left shoulder and back.  During most of this time period, he was given Ibuprofen for the pain, along with cold and hot packs.  He was also told to limit his recreational activity.  In addition, Plaintiff's injuries prevented him from engaging in physical exercise for approximately two or three months, that is, from the date of the incident on April 21, 2004 through the end of June or July 2004.

The Court acknowledges that there are some discrepancies in the medical records during this time period regarding the history and onset of Plaintiff's pain. The record of Plaintiff's May 6, 2004 visit with the prison nurse indicates that Plaintiff "pulled something" in his back about three months prior, which would make the onset date of his symptoms February 2004. Also, the record of Plaintiff's May 20, 2004 visit to the nurse indicates that Plaintiff had a history of lifting heavy things and that age might have been a factor in has back pain. The Court does not find these isolated references to other possible causes of his pain to defeat Plaintiff's claim that he endured pain and suffering due to Defendant's misconduct. The medical records from shortly after the April 21, 2004 incident, along with Plaintiff's testimony, are sufficiently consistent to indicate that he suffered real pain to his hand, shoulder, and back as a result of Defendant's misconduct.

In short, the Court finds that, at least for the period April 21, 2004 incident through July 9, 2004, Plaintiff's injury and his pain and suffering were attributable to Defendant's wrongful conduct and are therefore compensable. This is true, even though Plaintiff's injuries and pain may have been the result of an aggravation of his previous back problems caused by a car accident that occurred years prior to the incident. As noted above, a plaintiff's right to recover damages is not limited by the fact that his injuries may have resulted from an aggravation of a pre-existing condition.[50] The Court finds that Plaintiff should be compensated in the amount of $20,000.00 for the pain and suffering he endured during the period April 21, 2004 through July 9, 2004.

The Court will now turn to the incident that occurred on July 10, 2004, where Plaintiff fell off the sink in his cell and suffered a concussion. The medical records reveal that Plaintiff suffered severe head and neck pain and pain radiating down his back immediately after the fall and the day

---

[50]*See Trask v. Franco*, 446 F.3d 1036, 1046 (10th Cir. 2006) (recognizing that superceding cause cuts off defendant's continuing liability for damages under § 1983); *Warner v. Orange County Dep't of Probation*, 115 F.3d 1068, 1071 (2d Cir. 1997) (same).

after the fall.  The Court finds that the fall caused Plaintiff to suffer new injuries, and, as such, was a superceding cause which cuts off any continuing liability of Defendant for any back pain and related suffering caused by the April 21, 2004 incident.  In other words, Defendant's liability for compensatory damages should end as of July 10, 2004.

The Court notes that the medical record of November 15, 2004 indicates Plaintiff continued to suffer back pain after his July 10 fall from the sink.  That record, however, does not indicate that his back pain was caused by either the July 10 fall or the April 21, 2004 incident.  Rather, the record states that the onset date was "a couple years ago" and that the back pain was due to "lots of heavy lifting and a few car wrecks."[51]  Thus, the Court cannot find that this record supports a claim that Plaintiff continued to suffer pain in November 2004 as a direct result of the April 21, 2004 incident.

The same is true with respect to the November 24, 2004 record regarding Plaintiff's back pain.  Admittedly, that record does indicate that the onset date was seven months prior, which would coincide with the April 21, 2004 incident.   Nevertheless, given the conflicting medical records, the Court finds it impossible to discern whether the back pain reported on November 24, 2004 was a result of the fall from the sink, Plaintiff's history of heavy lifting, or some other cause.

It is not clear whether Plaintiff contends he is entitled to damages for any emotional distress or mental injury.  Although such damages were pled in the Pretrial Order, such damages are not addressed in the Application for Default Judgment and there was no request made for such damages at the default judgment hearing nor was any testimony provided about such damages.  The Court finds no basis to award any damages for emotional distress or emotional injury.

---

[51]Pl.'s Ex. 1, 11/15/2004 Non-Specific Musculoskletal Flow Sheet.

To summarize, the Court finds that Plaintiff suffered injuries and pain as a result of Defendant's wrongful conduct on April 21, 2004 and that Plaintiff should be compensated for those in the amount of $20,000.00 for the pain and suffering he endured during the period April 21, 2004 through July 9, 2004.

### 2.    Nominal damages

Plaintiff contends that he should also be awarded nominal damages. As the court is awarding actual damages, there is no reason or basis to award nominal damages.

### 3.    Punitive damages

The Court holds that Plaintiff should be entitled to recover $20,000.00 in punitive damages. Defendant's conduct was violent and unprovoked. The Court believes that such an amount would signal to prison authorities that the brutal treatment of prisoners will not be tolerated. The Court also believes that such an amount is commensurate with the gravity of Defendant's misconduct. Moreover, the Court finds that such an amount is proportional to the compensatory damages the Court believes Plaintiff should recover.

The Court is unable to assess the financial condition of Defendant, as Defendant failed to appear for his properly noticed deposition. Thus, it is difficult to determine with any precision what amount of punitive damages would have a deterrent effect on Defendant. Defendant's failure to participate in the action should not, however, preclude Plaintiff from receiving a punitive damage award.[52] To decline to award Plaintiff punitive damages because the Court does not know

---

[52]*Meitler Consulting, Inc. v. Dooley*, No. 05-2126-DJW, 2006 WL 4041752, at *6 (D. Kan. Nov. 1, 2006) (court may award punitive damages despite fact that plaintiff's evidence regarding defendant's financial condition may be non-existent due to defaulting defendant's failure to appear at deposition); *Beck v. Atlantic Contracting Co.*, No. 93-2480-JWL, 1994 WL 608598, at *1 (D. Kan. Oct. 14, 1994) ("a defendant's default, resulting in a plaintiff's inability to discover evidence on each of the criteria [relevant to the amount of an award of punitive damages] should result in barring a plaintiff from the recovery of punitive damages.").

Defendant's financial status would merely reward Defendant for refusing to appear for his deposition. Instead, the Court will take into consideration that Defendant was, at least at the time of the July 21, 2004 incident, an officer at a correctional facility with a salary commensurate with that type of job.

In light of the foregoing, the Court believes that an award of $20,000.00 in punitive damages would be appropriate to punish Defendant and to deter other prison guards from engaging in similar conduct.

## V.     Declaratory Relief

As noted above, Plaintiff seeks a declaratory judgment that Defendant's actions violated Plaintiff's rights under the Eighth and Fourteenth Amendments.

Although a claim for declaratory judgment is generally prospective, a court must treat declaratory relief as retrospective "to the extent that it is intertwined with a claim for monetary damages that requires [the court] to declare whether a past constitutional violation occurred.[53] Here, Plaintiff's claim for declaratory relief is intertwined with his claim for damages, in that both require a determination that a constitutional violation occurred in the past.

As the claim for declaratory relief is before the Court on Defendant's default, the Court believes it appropriate to enter a declaratory judgment finding that Defendant's actions on June 21, 2004 violated Plaintiff's rights under th Eighth and Fourteenth Amendments.

---

[53]*Lippoldt v. Cole*, 468 F.3d 1204,1217 (10th Cir. 2006) (quoting *PETA v. Rasmussen*, 298 F.3d 1198, 1202 n. 2 (10th Cir.2002); *Faustin v. City & County of Denver*, 268 F.3d 942, 948 (10th Cir.2001)).

**VI.    Attorney's Fees**

The Court in its discretion may allow the prevailing party to recover attorney's fees in any action or proceeding to enforce 42 U.S.C. § 1983.[54] The Court believes an award of attorney's fees would be appropriate in this case, as Plaintiff is a prevailing party.

A motion for attorney's fees must be made after judgment is entered.[55]   Consequently, Plaintiff should file an appropriate motion for fees after judgment has been entered.

## RECOMMENDATION

For the reasons set forth above, the undersigned respectfully recommends that judgment be entered in favor of Plaintiff Milo A. Jones against Defendant Justin Courtney for compensatory damages in the amount of $20,000.00 and punitive damages in the amount of $20,000.00.

In addition, the undersigned respectfully recommends that the Court enter a declaratory judgment that Defendant Justin Courtney violated Plaintiff Milo A. Jones' rights under the Eighth and Fourteenth Amendments.

Finally, the undersigned respectfully recommends that Plaintiff be awarded attorney fees pursuant to 42 U.S.C. § 1988 and that Plaintiff be directed to file a motion for fees pursuant to Federal Rule of Civil Procedure 54(d)(2).

Respectfully submitted.

---

[54]*See* 42 U.S.C. § 1988.

[55]*See* Fed. R. Civ. P. 54(d)(2) (claim for attorney fees shall be made by motion filed no later than fourteen days after entry of judgment and shall specify the judgment and statue or grounds entitling the moving party to the award).

Dated in Kansas City, Kansas on this 13th day of September, 2007.

                                        s/David J. Waxse
                                        David J. Waxse
                                        U.S. Magistrate Judge


cc:     All counsel and pro se parties